UNITED STATES, Appellee

v.

Ronald H. BARNETT Jr., Sergeant
U.S. Marine Corps, Appellant

No. 05-0322

Crim. App. No. 9901313

United States Court of Appeals for the Armed Forces

Argued April 18, 2006

Decided August 9, 2006

BAKER, J., delivered the opinion of the Court, in which GIERKE,
C.J., and CRAWFORD, EFFRON, and ERDMANN, JJ., joined.

Counsel

For Appellant:  Captain Rolando R. Sanchez, USMC (argued).


For Appellee:  Lieutenant Mark H. Herrington, JAGC, USNR
(argued); Commander Charles N. Purnell, JAGC, USN (on brief);
Lieutenant Kathleen Helmann, JAGC, USNR.



Military Judge:  R. L. Rogers



**THIS OPINION IS SUBJECT TO REVISION BEFORE PUBLICATION.**

Judge BAKER delivered the opinion of the Court.

Appellant was tried by general court-martial before officer and enlisted members. Contrary to his pleas, he was convicted of two specifications of violating a lawful general order, three specifications of maltreatment, one specification of making a false official statement, four specifications of indecent assault and one specification of indecent acts[1] in violation of Articles 92, 93, 107 and 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 892, 893, 907, 934 (2000). Appellant was acquitted of two specifications of violating a lawful general order, one specification of maltreatment, one specification of making a false statement and one specification of indecent assault in violation of Articles 92, 93 and 134, UCMJ. The adjudged and approved sentence included a bad-conduct discharge, confinement for two years, forfeiture of all pay and allowances, and reduction to grade E-1.

The United States Navy-Marine Corps Court of Criminal Appeals set aside the guilty findings under Charge I (two specifications of violating a general order) and the guilty findings under Charge II (three specifications of maltreatment of subordinates) as an unreasonable multiplication of charges.

---

[1] Appellant was originally charged with indecent assault under this specification. Appellant was acquitted of this offense, but found guilty of the lesser included offense of indecent acts.

United States v. Barnett Jr., No. 05-0322/MC

United States v. Barnett, No. NMCCA 9901313, 2004 CCA LEXIS 285, at *15, 2004 WL 3015292, at *5 (N-M. Ct. Crim. App. Dec. 30, 2004) (unpublished).  Aside from this error, the lower court found no further errors and affirmed, finding the approved sentence appropriate under United States v. Sales, 22 M.J. 305, 307-08 (C.M.A. 1986).  2004 CCA Lexis 285, at *27, 2004 WL 3015292 at *10.  We granted review of the following issue:

> WHETHER THE LOWER COURT ERRED WHEN IT DETERMINED THAT THE MILITARY JUDGE DID NOT ABUSE HIS DISCRETION BY ADMITTING EVIDENCE OF UNCHARGED MISCONDUCT IN VIOLATION OF MILITARY RULE OF EVIDENCE 404(b) OVER DEFENSE OBJECTION.

We hold that the military judge abused his discretion when he admitted the evidence of uncharged misconduct over defense objection.  However, we further hold that Appellant suffered no material prejudice to his substantial rights as a result of this error.  Therefore, we affirm.

BACKGROUND

Appellant, a twenty-nine-year-old sergeant in the Marine Corps at the time of his court-martial, was a member of Headquarters and Service Battalion, Marine Corps Base, Quantico, Virginia.  At the time of the alleged offenses, Appellant was serving as an instructor at Aberdeen Proving Ground (APG), Maryland.  The charges in Appellant's case stemmed from alleged incidents of unwanted physical and verbal advances by Appellant toward four female Army trainees at APG, Private (PVT) SD, PVT

3

SK, Private First Class (PFC) LT, and PFC BL, in the fall of 1997.

Prior to trial, defense counsel moved to suppress Appellant's statements on November 21, 1997, to special agents from the Naval Criminal Investigative Service (NCIS). Specifically, the defense sought to suppress a written statement made by Appellant detailing his physical encounters with PVT SK, PVT SD, and PFC LT. According to Appellant's written statement, he and the three trainees kissed, but it was voluntary and willing on their part. The military judge denied Appellant's motion to suppress. At trial, Appellant proceeded on a theory that the physical interactions between Appellant and the four trainees were in fact consensual, in accordance with his written statement to NCIS.

During pretrial motions, the Government sought to introduce the testimony of RB, a former Marine Lance Corporal, who was stationed with Appellant at Twentynine Palms, California, in the spring of 1994. In addition to her testimony, the Government also sought to introduce a Discrimination/Sexual Harassment Incident Report as part of Appellant's service record book. The two-page report detailed the investigation of RB's allegations and the actions taken against Appellant as a result. The Government offered both pieces of evidence under Military Rule of Evidence (M.R.E.) 404(b).

4

During a session pursuant to Article 39(a), UCMJ, 10 U.S.C. § 839(a) (2000), prior to trial, the trial counsel and the military judge had the following exchange on the admissibility of RB's testimony:

> MJ: What is -- how is it that this [sic] relevant? What does [RB] have to say about what happened in 1994, how is [sic] relevant to the offenses in this case?
>
> TC: Okay, sir. First, on the accused's intent, we've got offenses that have to do with the intent of the accused and these will [sic] talk about, we believe, this evidence will allow the members to see the accused's intent, what the case law that I've cited talks about as a predatory intent on the part of the accused. We have not -- well, we've got a few theories, sir. This is not by any chance the mantra that is exactly in the -- common plan, scheme, intent, motive. This is -- we've got three purposes, we're offering it, and first is the intent, second is to defeat the accused's claim that the acts were consensual, and third to show the accused's plan, if you will, to sexually harass, dominate and touch subordinate females that he's able to separate from the pack, if you will. And, admittedly the third and the first may merge at some point, but the evidence itself will give the members a picture of the accused's intent. And intent is relevant in this case.
>
> MJ: Okay. You focus on the intent. You believe that this evidence would be relevant on the issue of intent as it relates to the indecent assault specification?
>
> TC: That's correct, sir. We believe that and we believe also when you talk about the plan of the accused that that encompasses the sexual harassment and maltreatment aspects that were charged with it. And that's why I say at some point they may merge, but certainly we do believe it impacts on his intent to gratify his sexual

5

desire. The acts that [RB] will testify, the statements that he made, the repeated nature of the statements, the complete ignorance of [his] comments, please stop, leave me alone, just the complete roll over and you'll see how that and what has happened in the instance with these four victims, how that segues and we'll be able to show the members the intent of the accused here. It gives them a picture of it and we believe it is necessary for the government's case, it's relevant, material, and it's permissible.

In response, defense counsel objected to the introduction of RB's testimony on multiple grounds:

DC: I would ask how the government is going to link up [RB]'s testimony with Sergeant Barnett's intent? He's made -- Major Bowe has made some general propositions but there's a total lack of specificity here as to how whatever she says is going to prove either intent, plan, or defeat the claim of consent to Sergeant Barnett. I would state that these things are so temporally removed that there is no logical nexus in either times, place, or space between what happened in 1994 and what happened in 1997. . . . I believe what you're going to hear is no allegations of an indecent assault by [RB] at all. Basically they are the nature of repeated comments. She's going to say that she told him to stop a bunch of times and he didn't, whereas the allegations from Aberdeen once told to stop, Sergeant Barnett apparently did stop. In Aberdeen the allegations involved being [sic] one on one contact, being alone and trying to ensure that they're alone and in a closed space. Whereas, [RB] is going to say whenever one instance of touching occurred, occurred [sic] with a couple of other Marines in the room. There was no actual one on one contact with him, just a series of phone calls and comments . . . .

That being said . . . this is definitely going to fail the 403 legal relevancy test, definitely a substantial risk of unfair prejudice

6

> to the accused, confusion of the issues, and a great propensity to mislead the members, sir.

During another session pursuant to Article 39(a), UCMJ, the military judge ruled on the Government's motion to admit RB's testimony and the incident report:

> MJ: Gentlemen, the defense of mistake of fact has an essential part, whether it's mistake of fact as to a specific intent offense or a general intent offense, that the accused's mistake of fact as to consent, that's the mistake of fact at issue in this case, was honestly held, that he truly believed it that is, that in this case PFC [LT], [PVT SD], [PVT SK] and PFC [BL] consented to his touchings and comments . . . . The testimony of [RB] is relevant in that it shows that on a prior occasion that the accused was informed in what appear to be very clear terms that his conduct wasn't welcomed, and, hence, not consented to under similar circumstances. Hence, it's relevant in this proceeding. . . . I noted that they are relevant given the defense posture and the evidence which has been introduced in support of that posture. I will give a cautionary instruction to the members on the use of the evidence and, hence, I'm convinced that with that instruction being provided to the members both now and during -- or prior to their deliberations that the probative value of this evidence is not substantially outweighed by its prejudicial impact.
>
> . . . .
>
> The page 11 entry and the incident report which was provided to me for consideration on this matter in the Article 39(a) session previously, and which I have considered herein, are not admitted and will not be admitted pursuant to this. I find that their prejudicial impact to admit at this time the page 11 entry would be cumulative and that at this time that its introduction would be substantially more prejudicial than probative.

7

Before RB was brought before the members to testify, the military judge gave the following limiting instruction at the defense counsel's request:

> MJ: Evidence that the accused may have made sexually provocative comments to [RB] and may have touched her in a purportedly provocative manner may be considered by you for the limited purpose of its tendency, if any, to rebut the contention of the defense evidence that the accused's participation in the offenses of indecent assault under Charge IV with [PVT SD], [PFC LT], and [PVT SK], and the offenses of maltreatment in the specifications under Charge II with [PVT SD] and [PFC LT], [PVT SK], and [PFC BL] as the result of mistake on the accused's part as to consent on the part of the persons who were in Charge II and IV, which are before you, the object of the accused's alleged sexual touchings and/or comments. You may not consider this evidence for any other purpose and you may not conclude from this evidence that the accused is a bad person or has criminal tendencies and that he therefore committed the offenses which are charged and which are before the court.

The military judge repeated this instruction at the close of RB's testimony.

During the prosecution's case, all four of the complaining witnesses testified against Appellant. Although each of the trainee's testimony differed, three of the four trainees described a physical encounter with Appellant that included kissing and fondling. The fourth trainee testified that Appellant mentioned wanting to kiss her during class one morning

8

and also attempted to tickle her on another occasion.  None of the trainees testified that she told Appellant to stop.

RB testified that, while serving as the maintenance company clerk at Twentynine Palms in 1994, she and Appellant "had to communicate on a daily basis" for administrative reasons.  RB stated that she began receiving phone calls from Appellant that "started out on a business matter" but would then change.  When asked to elaborate on this change, RB offered the following: "The tone of his voice would change.  He started making comments [that] I had a sexy voice, things of that nature.  He would whisper comments to me over the phone."  When asked what specific comments Appellant made, RB stated that "[t]here [were] several comments ranging from, you have a sexy voice, you should have married a man like me, not your husband.  He made a comment that he wanted to know what it was like to have sex with a white pregnant woman.  I was pregnant at the time."  RB testified that in addition to Appellant's frequent phone calls, he also made similar comments to her in-person, although "[v]ery few times."  The only physical contact RB testified to was Appellant rubbing his arm on her arm while they were both seated in Appellant's office at his computer.

On the issue of consent, trial counsel and RB had the following exchange:

9

Q:  Now, when Sergeant Barnett made these comments to you over the phone, what would you say to him?

A:  On several occasions I asked him to stop.

Q:  Okay.

A:  Stop calling and hang up the phone.

Q:  When you would tell him to stop, stop -- give us an idea of what you would say to him?  Would you simply say stop or did you make a comment, what would it be?

A:  I started out just by saying, you know, you don't need to be saying these things.  Then it started being like you need to stop making these comments.

Q:  And when you would make your comment like that, you need to stop or stop making these comments, would Sergeant Barnett respond at all?

A:  No, sir, he did not.

Q:  And on occasion would more sexual comments follow?

A:  Yes.

Q:  And then you said you had to hang up the phone?

A:  Yes.

During closing arguments, trial counsel summarized the import of

RB's testimony:

Is the accused aware of what he is doing?  Is he aware of what he is doing, or is this a mistake?  Is he aware of what he is doing?  Ask yourself that.  And when you're thinking about that, and you're thinking about the four victims in this case, think about [RB].  Think about what happened to her three years before these events.

> She told you how she was sexually harassed by the accused. Not anything like these privates, not anything like these privates. Touched, the comments, "You shouldn't have married him, you should have married a guy like me."
>
> She says no. Why is this important? Why is that important, "She says no"? Because it doesn't matter. She tells you she says no. She has to hang up on him. She has to hang up on him a number of times. Sometimes he comes and visits her and he says it, and she can't hang up. You get a picture of what these privates were going to go through.

Trial defense counsel, by contrast, reiterated Appellant's mistake of fact defense:

> The military judge is going to instruct you, mistake of fact is a defense to indecent assault, sexual harassment, mistreatment. What was going on through Sergeant Barnett's mind? It doesn't even have to be reasonable for indecent assault. No matter how unreasonable, as long as he perceived there was consent -- and you see that in his statement -- and you saw that from the testimony of these girls, that they said no and he kept going and they didn't do anything, they said nothing, he kept going. You know, a reasonable person would consider that to be consent.

Following closing arguments, the military judge instructed the members on the mistake of fact defense and repeated his earlier limiting instruction with regard to RB's testimony.

On review, the lower court applied the three-part test set forth in United States v. Reynolds, 29 M.J. 105, 109 (C.M.A. 1989), to determine whether RB's testimony should have been admitted under M.R.E. 404(b). Barnett, 2004 CCA LEXIS 285, at

11

*3-*4, 2004 WL 3015292, at *1-*2.  The lower court concluded that the evidence had been properly admitted and that the military judge did not abuse his discretion.  2004 CCA LEXIS 285, at *6-*7, 2004 WL 3015292 at *2.

> First, the finder of fact could reasonably conclude that the acts RB complained of did occur and that the appellant is the person who committed those acts. . . .  Second, the appellant's commission of the prior acts is probative of whether he believed the victims consented to his physical contact.  Consent was a material issue raised by the appellant in his own defense.  Third, while the relevant evidence was prejudicial to the appellant, the danger of unfair prejudice did not substantially outweigh its probative value.  The military judge gave a cautionary instruction immediately before and after RB's testimony and again before deliberations on findings.

2004 CCA LEXIS 285, at *6, 2004 WL 3015292, at *2 (footnote omitted).

On appeal to this Court, Appellant argues that the military judge abused his discretion when he allowed RB to testify.  According to Appellant, RB's testimony fails all three of the prongs in Reynolds.  Specifically, Appellant argues that RB's testimony was not probative of Appellant's mistake of fact defense "because her allegations constituted completely different facts and circumstances."  With regard to the third prong, Appellant argues that the probative value of RB's testimony did not outweigh its prejudicial value.  "[RB]'s testimony only created a picture of Appellant's propensity to

12

engage in inappropriate behavior.  The unfair prejudicial effect of [RB]'s testimony included that Appellant was obsessive and possessed uncommon sexual fetishes."

In response, the Government argues that the military judge did not abuse his discretion and that he properly applied the three-prong test in Reynolds.  The Government further asserts that, even if the military judge did err, there was no material prejudice to Appellant's substantial rights.  In support of this conclusion, the Government summarizes the evidence in this case, and reiterates the strength of the Government's case at trial.

DISCUSSION

"A military judge's decision to admit or exclude evidence is reviewed under an abuse of discretion standard."  United States v. McDonald, 59 M.J. 426, 430 (C.A.A.F. 2004) (citing United States v. Tanksley, 54 M.J. 169, 175 (C.A.A.F. 2000), overruled on other grounds by United States v. Inong, 58 M.J. 460, 464 (C.A.A.F. 2003)).  "[A] military judge abuses his discretion if his findings of fact are clearly erroneous or his conclusions of law are incorrect."  United States v. Ayala, 43 M.J. 296, 298 (C.A.A.F. 1995).

M.R.E. 404(b)[2] provides, in relevant part:

---

[2] Although M.R.E. 413 permits evidence of similar crimes in sexual assault cases, we do not decide whether the evidence in this case would have been admissible under M.R.E. 413 for two reasons.  First, M.R.E. 413 was not in effect at the time of

13

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . .

As noted, this Court in Reynolds established a three-part test to determine the admissibility of uncharged misconduct under M.R.E. 404(b):

> 1.  Does the evidence reasonably support a finding by the court members that appellant committed prior crimes, wrongs or acts?

> 2.  What "fact . . . of consequence" is made "more" or "less probable" by the existence of this evidence?

> 3.  Is the "probative value . . . substantially outweighed by the danger of unfair prejudice"?

29 M.J. at 109 (citations omitted).  The evidence at issue must fulfill all three prongs to be admissible.  Id.  "The first and second prongs address the logical relevance of the evidence." McDonald, 59 M.J. at 429; M.R.E. 401; M.R.E. 402; see also Huddleston v. United States, 485 U.S. 681, 686-87, 689 (1988). "The third prong ensures that the evidence is legally, as well as logically, relevant."  McDonald, 59 M.J. at 429; M.R.E. 403; see also Huddleston, 485 U.S. at 687-88.

Here, as detailed above, trial counsel offered three

---

Appellant's court-martial.  See United States v. Morrison, 52 M.J. 117, 121 n.4 (C.A.A.F. 1999).  Second, Appellant's uncharged misconduct does not qualify as sexual assault under M.R.E. 413.

theories to support admission of the uncharged misconduct evidence, including intent,[3] plan,[4] and to rebut Appellant's mistake of fact defense. Despite defense counsel's objection, the military judge admitted the evidence as relevant to rebut Appellant's claim that the four trainees consented to his advances. Specifically, as noted previously, the military judge stated that RB's testimony was "relevant in that it shows that on a prior occasion . . . the accused was informed in what appear to be very clear terms that his conduct wasn't welcomed, and, hence, not consented to under similar circumstances."

Resolution of the issue in this case centers around the second and third prongs of Reynolds. The first question in this case is one of logical relevance -- whether the factual dissimilarities between the offenses charged at trial and the

---

[3] As noted, trial counsel offered the following explanation when pressed by the military judge on the theory of intent:

> [C]ertainly we do believe that it impacts on his intent to gratify his sexual desire. The acts that [RB] will testify, the statements that he made, the repeated nature of the statements, the complete ignorance of [his] comments, please stop, leave me alone, just the complete roll over and you'll see how that and what has happened in the instance with these four victims, how that segues and we'll be able to show the members the intent of the accused here.

[4] As noted, trial counsel offered the following explanation on the theory of plan: "[A]nd third to show the accused's plan, if you will, to sexually harass, dominate and touch subordinate females that he's able to separate from the pack . . . ."

15

prior uncharged misconduct were so great such that the military judge abused his discretion when he allowed RB to testify. The second question in this case, assuming the prior uncharged misconduct was logically relevant, is one of legal relevance -- whether any unfair prejudice created by the evidence outweighed its probative value. We address these two questions in turn.

## Logical relevance

The military judge's ruling to admit the evidence was premised on two related implicit findings, first, that because RB did not consent to his actions, Appellant should have known that the four trainees also did not consent, and, second, that Appellant should have known because the circumstances were similar in nature.

With regard to the first implicit finding, consent, as a legal matter, and in the context of adult relations, is a fact-specific inquiry that must be made on a case-by-case basis. See United States v. Hibbard, 58 M.J. 71, 75-76 (C.A.A.F. 2003); see Manual for Courts-Martial, United States pt. IV, para. 45.b.(1)(b) (2005 ed.) (MCM). In this case, the facts are such that consent, or lack thereof, cannot be determined with reference to the prior uncharged misconduct. With RB, Appellant engaged in escalating verbal harassment of a coworker, resulting in RB explicitly telling Appellant to stop calling her and to stop making inappropriate comments. By contrast, with the four

16

trainees, Appellant engaged in largely continuous physical harassment of subordinates in a teaching environment where he was never explicitly told to stop.  Regardless of whether Appellant should have known that his advances toward subordinate female trainees were inappropriate, RB's requests that Appellant stop calling her and stop making sexual comments does not show that Appellant could not have mistakenly believed that any of the four trainees consented to his later actions.

With regard to the second implicit finding, there are significant factual differences between the circumstances RB described and those the four trainees described, aside from those noted above.  In Morrison, this Court conducted a six-part analysis of prior uncharged misconduct to determine admissibility under M.R.E. 404(b) where the accused was charged with multiple specifications of child molestation.  52 M.J. at 122-23.  Citing United States v. Munoz, 32 M.J. 359, 363 (C.M.A. 1991), this Court identified the following as relevant to its analysis:  (1) the "[r]elationship between victims and appellant"; (2) the "[a]ges of the victims"; (3) the "[n]ature of the acts"; (4) the "[s]itus of the acts"; (5) the "[c]ircumstances of the acts"; and (6) the "[t]ime span."  Id. All but the second criterion is relevant to this case.  We examine these criteria in turn.

Relationship between the victims and appellant:  Unlike the

17

four trainees, who were students under Appellant's supervision, RB testified that she had only an administrative relationship with Appellant in which she was not subject to his supervision.

Nature of the acts:  RB testified that the only physical contact she had with Appellant was when he rubbed his arm against hers while they were both seated at the computer in his office.  By contrast, three of the four trainees testified to repeated overt sexual acts that included kissing and fondling. The fourth trainee testified that Appellant mentioned wanting to kiss her during class one morning and also attempted to tickle her on another occasion.

Situs of the acts:  RB testified that Appellant made inappropriate comments toward her over the telephone and also in-person when he would stop by her office.  The one incident of touching occurred in Appellant's office.  By contrast, Appellant's statements to the four trainees were always in-person.  Furthermore, Appellant's comments and actions did not occur in an office setting, but rather, in the context of his teaching duties, in a tank, for example, or in a classroom.

Circumstances of the acts:  In this case, as in Morrison, there is no common theme.  52 M.J. at 123.  While there are multiple, notable similarities between the circumstances of Appellant's acts towards the four trainees, as compared to the circumstances of Appellant's largely verbal conduct toward RB,

18

the similarities are few.

Time span:  The charges against Appellant stem from incidents occurring in late October 1997 through early November 1997.  By contrast, RB testified that her encounters with Appellant were from April 1994 until August of 1994.

In sum, the evidence of Appellant's prior uncharged misconduct with RB had only marginal logical relevance to the present charged conduct.  Despite trial counsel's arguments to the contrary, RB's explicit instructions to Appellant to stop are not probative of whether Appellant reasonably could have mistaken the four trainees' silence as consent.  Furthermore, the evidence is only marginally relevant under either of the other two theories trial counsel offered -- intent and plan.  During trial counsel's lengthy proffer to the military judge, he argued that RB's testimony would be probative of Appellant's "predatory intent" and also "to show the accused's plan . . . to sexually harass, dominate and touch subordinate females that he[] [was] able to separate from the pack . . . ."  However, both of these alternative bases for admissibility are weak.  As in Morrison, "[t]he charged acts were so overtly sexual that motive and intent were not in issue."  52 M.J. at 123.  In addition, Appellant's actions toward RB, and the context in which they occurred, do not tend to show a common plan.  RB was not a subordinate female to Appellant in the same way that the

trainees were.  As noted, Appellant and RB had a purely administrative, as opposed to an instructive, relationship.  In addition, there was no "pack" from which Appellant could separate RB.

### Legal relevance

Even assuming the evidence of Appellant's prior uncharged misconduct was logically relevant, to be admissible, it must still pass the test of legal relevance under the third prong of Reynolds.  Recently, in United States v. Berry, this Court outlined the following criteria for testing legal relevance:

> In conducting the M.R.E. 403 balancing test a military judge should consider the following factors:  the strength of the proof of the prior act; the probative weight of the evidence; the potential to present less prejudicial evidence; the possible distraction of the fact-finder; the time needed to prove the prior conduct; the temporal proximity of the prior event; the frequency of the acts; the presence of any intervening circumstances; and the relationship between the parties.

61 M.J. 91, 95-96 (C.A.A.F. 2005) (citing United States v. Wright, 53 M.J. 476, 482 (C.A.A.F. 2000)).

In his ruling on the defense motion, the military judge did not conduct the balancing inquiry under M.R.E. 403 on the record.  See id. at 96 ("Where the military judge is required to do a balancing test under M.R.E. 403 and does not sufficiently articulate his balancing on the record, his evidentiary ruling will receive less deference from this court.").  Instead, the military judge stated the following:  "I'm convinced that with

that instruction being provided to the members both now and during -- or prior to their deliberations that the probative value of this evidence is not substantially outweighed by its prejudicial impact."

As defense counsel argued at trial, RB's testimony carried a "substantial risk of unfair prejudice" to Appellant including "confusion of the issues, and a great propensity to mislead." Both of these statements are true. The issue in this case was whether the four trainees consented to Appellant's actions. RB's testimony was, at best, marginally probative on this point. Furthermore, in order to challenge RB's credibility, the defense called various witnesses to rebut her claims and also to refute what she claimed reporting at the time of the incident. Just as importantly, RB's testimony raised the specter of unfair prejudice in two ways. First, RB's testimony portrayed Appellant to the members as not just a noncommissioned officer who abused his authority over trainees, but as a sergeant who made advances toward the Marine wife of another Marine. Second, some of Appellant's comments included racial overtones. RB testified that a "few times" Appellant told her that "he wanted to know what it was like to have sex with a white pregnant woman."

In light of the marginal relevance of RB's testimony, we conclude that the danger of unfair prejudice from these aspects

of RB's testimony substantially outweighed the probative value of the evidence.  In this context, the military judge's limiting instruction could not eliminate the unfair prejudice created by RB's testimony in light of its low probative value coupled with the nature of the prejudice.  Cf. United States v. Owens, 21 M.J. 117, 124 (C.M.A. 1985) (finding a limiting instruction that restricted members' consideration to an issue on which prior act evidence had "considerable probative value" substantially reduced evidence's "prejudicial tendencies").

For the above reasons, even assuming the evidence was logically relevant, the military judge erred when he found that the danger of unfair prejudice did not substantially outweigh its probative value.  M.R.E. 403.  Therefore, the evidence in this case fails to fulfill not only the second, but also the third prong of Reynolds.

Prejudice

Having determined that the military judge abused his discretion, we must now determine whether this error resulted in material prejudice to Appellant's substantial rights.  Article 59(a), UCMJ, 10 U.S.C. § 859(a) (2000).  "We evaluate prejudice from an erroneous evidentiary ruling by weighing (1) the strength of the Government's case, (2) the strength of the defense case, (3) the materiality of the evidence in question, and (4) the quality of the evidence in question."  United States

United States v. Barnett Jr., No. 05-0322/MC

v. Kerr, 51 M.J. 401, 405 (C.A.A.F. 1999) (citing United States

v. Weeks, 20 M.J. 22, 25 (C.M.A. 1985)).

Here, the Government's case, aside from RB's testimony and the two-page incident report, was strong. All four of the complainants testified and there were similarities between their respective rendition of events. There is nothing in the record to indicate that these four individuals were not credible witnesses. The defense, by contrast, did not present a compelling case. The crux of Appellant's defense was that he reasonably believed that the four trainees consented to his actions. However, all four denied that the encounters were consensual and each recounted some type of nonverbal manifestation of their unwillingness to be touched by Appellant.[5] Finally, the evidence involving RB, even if relevant, was of marginal importance given the difference in contexts. As stated above, the events involving RB happened almost three years earlier. In addition, the defense brought in two witnesses to rebut RB's version of events. For these reasons, we hold that the erroneous admission of RB's testimony was harmless error.

---

[5] PVT SD testified that she pulled her legs together when Appellant touched her legs and pubic area and pushed his hand away when Appellant rubbed her breast. PFC BL testified that she elbowed Appellant out of the way when he tried to tickle her. PFC LT testified that she pushed Appellant away twice when he kissed her. PVT SK testified that she pulled away when Appellant kissed her.

23

DECISION

The decision of the United States Navy-Marine Corps Court of Criminal Appeals is affirmed.